UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TAUREAN PROCH, individually and on behalf of a class of similarly situated persons, | Case No. 2:22-cv-12141 |
| | Judge:  Laurie J. Michelson |
| Plaintiff, | Mag. Judge Patricia T. Morris |
| v. | |
| SHERIFF MAT KING, LIEUTENANT RICHARD OLEJNIK, LIEUTENANT KYLE ADAMS, ST. CLAIR COUNTY, MICHIGAN, SECURUS TECHNOLOGIES, LLC, | |
| Defendants. | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO THE COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

QUESTIONS PRESENTED .......................................................................iii

CONTROLLING AND MOST APPROPRIATE AUTHORITIES ...................iv

STATEMENT OF FACTS ........................................................................1

ARGUMENT ..........................................................................................7

   I. The Mail Policy Violated Plaintiff's First Amendment Rights............................7

     A.   The Policy is Not Rationally Connected to a Legitimate Interest ................8

     B.   Alternative Means of Communication Are Not Available .........................13

     C.   Eliminating the Mail Policy Will Not Negatively Affect Jail Operations.....16

     D.   Ready Alternatives Indicate the Mail Policy Is an Exaggerated Response ..17

     E.   Defendants Are Due Minimal Deference .................................................18

   II. Defendants Violated Plaintiff's Due Process Rights............................................19

   III. A Jury Could Reasonably Find That Defendants Retaliated
      Against Plaintiff .......................................................................................25

   IV.  Each Defendant Is Liable for These Constitutional Violations .....................30

   V.   The Individual Defendants are not Entitled to Qualified Immunity.............32

   VI.  Plaintiff's Claims for Injunctive and Declaratory Relief Are Not Moot........34

CONCLUSION......................................................................................35

## QUESTIONS PRESENTED

1. Have Defendants shown as a matter of law that the Jail's postcard-only policy does not violate Mr. Proch's First Amendment rights?

   Plaintiff's Answer: No.

2. Have Defendants shown as a matter of law that the Jail had a policy of providing adequate due process to Mr. Proch and other incarcerated people when their mail was rejected?

   Plaintiff's Answer: No.

3. Have Defendants shown as a matter of law that they did not retaliate against Mr. Proch for exercising his First Amendment rights?

   Plaintiff's Answer: No.

4. Have the individual Defendants shown as a matter of law that they are not entitled to qualified immunity?

   Plaintiff's Answer: No.

5. Are Mr. Proch's claims for declaratory and injunctive relief moot?

   Plaintiff's Answer: No.

## CONTROLLING AND MOST APPROPRIATE AUTHORITIES

*Hill v. Lappin*, 630 F.3d 468, 473 (6th Cir. 2010)

*Hum. Rts. Def. Ctr. v. Bezotte*, 2017 WL 1250683 (E.D. Mich. Mar. 31, 2017)

*Martin v. Kelley*, 803 F.2d 236 (6th Cir. 1986)

*Prison Legal News v. Columbia Cnty.*, 942 F. Supp. 2d 1068 (D. Or. 2013)

*Prison Legal News v. Cnty. of Ventura*, 2014 WL 2736103 (C.D. Cal. June 16, 2014)

*Procunier v. Martinez*, 416 U.S. 396 (1974)

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999)

*Turner v. Safley*, 482 U.S. 78 (1987)

## STATEMENT OF FACTS

The St. Clair County Jail ("the Jail") is a 491-bed facility that houses many people who have not been convicted of any crime, including people who are awaiting trial or are in federal immigration custody. ECF No. 117-4, PageID.1486, 45:8-19. The Jail is overseen by Defendant Sheriff Mat King. ECF No. 117-4, PageID.1485, 44:11-13; ECF No. 117-3, PageID.1359, 15:16-18. Though King is the final decisionmaker with respect to all Jail policies and procedures, ECF No. 117-3, PageID.1359-61, 15:25-16:9; 17:6-10; 17:22-18:2; ECF No. 117-4, PageID.1480, 39:5-6; Mich. Comp. Laws § 51.75, day-to-day operations at the Jail are overseen by two Lieutenants, Defendants Richard Olejnik and Kyle Adams. ECF No. 117-4, PageID.1478, 37:8-39:2; PageID.1495, 54:9-11; PageID.1496-97, 55:9-56:11; ECF No. 117-3, PageID.1359, 15:24-25. The Lieutenants report directly to Jail Administrator Tracy DeCaussin, who reports to both the Undersheriff and to Sheriff King. Ex.1, 23:6-24:13.

The County has long contracted with Securus Technologies to provide phone services. Ex. 2, 57:18-58:4. In September 2017, after a request for proposal process, the County entered into a "revenue generating" three-year contract with Securus to add video calling, which would be used to replace free in-person visitation at the Jail. *See* ECF No. 119-5, PageID.2743-65; Ex. 3 at 00:23-30. Securus was selected in part because it promised a lucrative 78% commission on telephone calls and 50% commission on video calls, with a minimum annual guarantee of $190,000. Ex. 3 at 1:54-2:05, 4:24-5:09; ECF No. 119-5, PageID.2743-65; Ex. 4 at 3. But this revenue came at the expense of the people incarcerated at the Jail and their loved ones, who had to pay $12.99 per 20-minute video call and .21 cents per minute for phone calls, while no

1

longer being able to visit each other in person. ECF No. 119-5, PageID.2742-65; Ex. 2, 83:12-13. In 2020, the County and Securus amended their contract to add tablet services. Unlike in 2017, the County did not request proposals, instead accepting the amendment that Securus offered. Ex. 1, 184:1-17; 199:4-9. Under the amended contract, Securus provided tablets that incarcerated people could use to make phone and video calls and send messages for a fee. ECF No. 119-6, PageID.2767-70. And as with the 2017 contract, the County stood to make a profit: it would receive 20% of the revenue from eMessages. *Id.* at PageID.2769. Those profits started to materialize in January 2022 when the eMessaging service went live. Ex. 2, 131:24-132:15; ECF No. 117-14, PageID.2143. In April 2022, DeCaussin took note: "As the revenues show, [switching to Securus] was a good move for us." Ex. 5. In total, the County made nearly half a million dollars in revenue from Securus in 2022, Ex. 6, ¶ 125; ECF No. 117-14, money that could be used not just for the Jail, but for any County expenditures, Ex. 1, 63:9-17; ECF No. 117-6, PageID.1765; Ex. 6, ¶ 135.

As they rolled out the tablets, Defendants also considered restricting incoming mail, supposedly prompted by the suspicion that drugs were entering the Jail through the mail. ECF No. 117-12. In fact, they did not know whether drugs were a problem at the Jail or how any drugs entered the Jail because, when suspected drugs were found, they rarely took steps to determine what they were or where they came from. Ex. 6, ¶¶ 47-64; Ex. 7, 37:3-85:12; *see also* Section I(A), *infra*. And since at least January 2020, there had been no confirmed incidents of drugs entering the Jail through the mail. Ex. 6, ¶ 65-66.

On July 15, 2022, the Jail adopted a new mail policy, effective August 1, 2022,

("the Mail Policy") providing that "[a]ny general mail incoming to the facility must be in the form of postcards only," and that the postcards must be "plain." ECF No. 117-7, PageID.1769. It also restricted publications to only those for which the recipient had a "paid subscription" and books to only those that were "new" and sent directly from a bookstore or publisher. *Id.*, PageID.1770-71. The postcard-only restriction did not apply to "Special Correspondence," including mail from "private attorneys and other legal representatives; government attorneys; judges; courts;" and other officials. *Id.*, PageID.1768. But that exception applied only if the envelope "clearly indicat[ed] that the correspondence is special." *Id.*, PageID.1771, 1768.

With these restrictions, people at the Jail could no longer receive many types of mail, including full-page documents, letters, drawings, greeting cards, photos, books or publications from loved ones, religious resources, brochures and course catalogs from educational providers, and other community resources to help with re-entry readiness. Ex. 8, ¶¶ 8-11; ECF No. 119-17, PageID.3226, 39:24-40:12; Ex. 6, ¶ 42. And the only other options for communicating with the outside world—Securus's services—were costly, inaccessible, plagued with technological problems, and subjected users to extensive invasive surveillance. ECF No. 117-1, PageID.1300; Ex. 8, ¶ 6; Ex. 2, 170:8-184:8; Ex. 6, ¶¶ 103-114; Ex. 9 at 15, 19-20; *see also* Section I(B), *infra*. And even without those problems, "these other means of communication are simply not a substitute for mail" because people cannot keep items like drawings or handwritten letters "that have value in their physical form." Ex. 6, ¶ 112.

The new policy also described the "procedure" for processing and inspecting

incoming mail. First, wearing gloves, a deputy would inspect mail for contraband, including removing stamps. ECF No. 117-7, PageID.1770. If contraband was found, the deputy would notify a supervisor. *Id.* Then, "[g]eneral mail will be photocopied front and back," and the "original general mail will be disposed of after being copied." *Id.*, PageID.1769. Finally, the deputy would "deliver the sorted/labeled/copied mail to each housing unit." *Id.* Notably, the policy said nothing about notifying recipients that their mail has been returned to sender. *See* ECF 117-7. Instead, the policy vaguely provided that "[a]ny incoming or outgoing mail that is refused and not accepted or mailed out will be documented." *Id.*, PageID.1769.

In deciding whether to adopt the mail policy, Defendants did not consider less rights-restrictive alternatives to accomplish their stated goal of reducing contraband. For example, although DeCaussin suggested that they get a quote for a mail scanning machine and include it in their budget request, Ex. 10; Ex. 1, 81:8-83:20, no one ever followed through and obtained a quote or pursued that option further, Ex. 1, 85:19-86:4, despite such machines being considered an effective and efficient means of identifying contraband without restricting the rights of incarcerated people, Ex. 6, ¶ 89; ECF No. 117-10, PageID.2123; ECF No. 117-26, PageID.2462. And Defendants never considered other methods of combatting contraband, like searching Jail staff or investigating the source of the contraband that was found at the Jail. Ex. 6, ¶¶ 91-101.

When the mail policy was implemented, the deputies who processed the mail did not consistently provide notice to people incarcerated at the Jail when their mail was rejected. Ex. 8, ¶¶ 12-13; ECF No. 117-4, PageID.1611, 170:4-8; PageID.1612,

171:5-9. Defendants were not able to say how often mail violation notices were provided or produce more than a handful of examples of such notices, most of which were filled out incorrectly. ECF No. 117-18; ECF No. 119-17, PageID.3241, 55:3-9; PageID.3247, 61:17-20; ECF No. 117-4, PageID.1636-37, 195:15-196:13. And Mr. Proch is aware of at least three instances in which mail intended for him was returned without any notice. Ex. 8, ¶¶ 12-13. Nor did Defendants provide an opportunity to challenge the determination that mail was non-compliant before it was returned. ECF No. 117-4, PageID.1608-09,167:19-168:1. Although someone could theoretically pursue a grievance through the regular process, the mail was returned to sender immediately, so the mail would be gone before any relief could be obtained. ECF No. 117-4, PageID.1608-09,167:19-168:1. As a result of this lawsuit, the Jail instituted a new process in April 2023 in which the Lieutenants reviewed each piece of rejected mail and notified the sender that the mail had been rejected, while holding it for 5 business days. ECF No. 117-4, PageID.1600-1602, 159:15-161:21; PageID.1603, 162:3-9; ECF No. 119-17, PageID.3237-39, 51:3-53:10. These changes increased the time required to process mail. ECF No. 119-17, PageID.3239, 53:11-15. Yet incarcerated people still lacked a meaningful opportunity to appeal. ECF No. 119-17, PageID.3239, 53:16-20.

Throughout his time at the Jail, Plaintiff exercised his constitutional right to file grievances, ECF No. 117-15, and, in September 2022, he filed this action in federal court, ECF No. 1. From the beginning, Defendants interfered with his rights. For example, when Plaintiff sent a letter to the Court requesting a civil complaint form to file this action, the form was delayed for more than 10 days until he filed a grievance. ECF

No. 117-15, PageID.2241-42. Then, Defendants refused to respond to Plaintiff's inquiry about their full names so they could be properly served, delaying service and putting the case at risk of dismissal. ECF No. 117-15, PageID.2228-29; ECF No. 7; ECF No. 10. And Defendants refused to let Plaintiff print copies of his grievances so he could file them to show exhaustion of administrative remedies. ECF No. 117-15, PageID.2221-22. Despite those obstacles, Plaintiff continued to pursue this action.

In March 2023, after his release, Plaintiff received a bill from the Jail requiring him to pay more than $13,700 as "reimbursement" for his incarceration, even though the Jail had conducted no investigation of his financial status as required by Michigan law, Mich. Comp. Laws § 801.83. *See* ECF No. 117-22, PageID.2358-59, 66:13-67:4; ECF No. 117-23, PageID.2437. In April 2023, Plaintiff once again exercised his First Amendment rights by sending a letter to King disputing the debt. ECF No. 117-23, PageID.2436. The Jail Reimbursement Clerk, Karen Roy, responded on King's behalf, asserting that the County could sue to collect the debt, and concluding with a threat: "Please advise whether such a suit will be necessary." ECF No. 117-23, PageID.2438. But the County did not have authority to sue Mr. Proch because no effort had been made to ascertain whether he could pay. *See* Mich. Comp. Laws § 801.83. Indeed, in all of 2022 and 2023, the Jail filed only three debt collection suits, and it did so only after efforts to collect the debt for more than a year after release were unsuccessful. *See* Ex. 11. Mr. Proch's debt had been outstanding for only about a month and had not been sent to collections. ECF No. 117-23, PageID.2437.

## ARGUMENT

### I.    The Mail Policy Violated Plaintiff's First Amendment Rights

Defendants argue that the Mail Policy is constitutional based on *Simpson v. County of Cape Girardeau*, 879 F.3d 273, 281 (8th Cir. 2018), an out-of-circuit decision upholding the constitutionality of a postcard-only restriction on appeal from a bench trial. *See* ECF No. 117 at 11-12. But as the Eighth Circuit emphasized in a case discussing *Simpson*, "none of our past cases . . . support the proposition that a postcard-only mail policy is always or never permissible under the First Amendment," and "[d]ifferent jails with different facts can result in different outcomes." *Hum. Rts. Def. Ctr. v. Baxter Cnty.*, 129 F.4th 498, 506-07 (8th Cir. 2025). Indeed, many courts, including this one, have reached the opposite conclusion from *Simpson*. *See Hum. Rts. Def. Ctr. v. Bezotte*, 2017 WL 1250683, at *11 (E.D. Mich. Mar. 31, 2017) (denying summary judgment to Michigan county on a First Amendment challenge to a virtually identical postcard-only policy); *Prison Legal News v. Columbia Cnty.*, 942 F. Supp. 2d 1068, 1096 (D. Or. 2013) (enjoining defendants from restricting all incoming and outgoing inmate personal mail to postcards only); *Prison Legal News v. Cnty. of Ventura*, 2014 WL 2736103, at *4–5 (C.D. Cal. June 16, 2014) (ordering defendants to suspend enforcement of postcard-only policy for incoming mail).

Instead of a categorical rule, courts apply the four factors from the Supreme Court's decision in *Turner v. Safley*, 482 U.S. 78, 89 (1987), to the facts of each case. First, there must be "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest." *Id.* at 89 (citation omitted). If "the logical connection between the regulation and the asserted goal is so remote as to render the

policy arbitrary or irrational," *id.* at 89-90, "the regulation fails, irrespective of whether the other factors tilt in its favor," *Shaw v. Murphy*, 532 U.S. 223, 229-30 (2001). If the first factor is satisfied, a court must still consider three additional factors: (1) "whether there are alternative means of exercising the [asserted constitutional] right" available; (2) the "impact accommodation of the asserted constitutional right will have on guards and other [incarcerated people], and on the allocation of prison resources generally"; and (3) the availability of reasonable and less intrusive alternatives, which "may be evidence that the regulation is not reasonable" and is instead "an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90. The Mail Policy fails every factor. And, at the least, because there are genuine disputes of material fact as to each factor, summary judgment is unwarranted.

### A.    *The Policy is Not Rationally Connected to a Legitimate Interest*

Defendants assert that "[t]he main goal" of the Mail Policy "was to reduce the risk of contraband, primarily illicit substances, from entering the jail." ECF No. 117 at 4. They also argue that the policy was adopted to "reduc[e] the time necessary to process incoming mail." *Id.* at 14. But the actual reason the Mail Policy was enacted was to generate revenue by extracting money from incarcerated people and their families. *See Walker v. Sumner*, 917 F.2d 382, 386 (9th Cir. 1990) (under *Turner*, a defendant must show that the "specific penological interests" they identify "are the *actual* bases for their policies" (emphasis added)).

First, as described below, there was "an exceedingly low incidence of illicit drugs" entering the Jail in the years leading up to adoption of the Mail Policy, suggesting that

8

contraband was not the real reason for adopting the policy. Ex. 6, at ¶ 67. Had contraband been a true concern, Defendants could have taken minimum steps to investigate and interdict it, such as documenting and testing suspected drugs, and investigating allegations of drug smuggling. *See id.* at ¶¶ 55, 60-61. Second, Defendants admitted they consider revenue and the budget when deciding whether to enact policies, undermining their assertion that revenue was not a consideration. *See* ECF No. 117-4, PageID.1512, 71:18-21; Ex. 1, 86:20-87:4; ECF No. 119-17, PageID.3221-22, 35:17-36:1. Third, Defendants were well-aware that restricting avenues for communication could increase revenues because they had already seen that happen by ending in-person visitation and replacing it with paid video visits. *See* Ex.3; Ex. 12 at 4; Ex.13. And just months before the mail policy was enacted, DeCaussin praised the fact that revenue had increased after the switch to Securus as a tablet provider. Ex. 5; Ex. 1, 62:2-7; 63:9-17. From this, a jury could conclude that Defendants learned from their experience with ending in-person visits that restricting alternatives to Securus's services would increase revenue, and that they enacted the mail policy for that reason. Because the Mail Policy was adopted for financial gain, it is invalid—even if the other *Turner* factors weigh in its favor—because generating revenue is not a legitimate governmental interest, much less a penological one. *See United States v. Hardman*, 297 F.3d 1116, 1127 (10th Cir. 2002) ("[A] desire for federal funds is not a compelling interest."); *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 336 (3d Cir. 1987) ("objection to the costs" of providing medical care "fail[ed] to state a legitimate governmental interest sufficient to justify the County's policy").

And even if preventing contraband, not increasing revenue, was the reason for the Mail Policy, it fails *Turner* because it is not rationally connected to that objective. *See, e.g., Columbia Cnty.*, 942 F. Supp. 2d at 1083 ("There is not an intuitive, common-sense connection between the postcard-only policy and enhancing jail security."). The evidence shows that there was not a significant problem with contraband at the Jail. Ex. 6, ¶ 47, 67. In the years before the adoption of the mail policy, there were no confirmed incidents of drugs being introduced through the mail, and relatively few incidents of contraband in general. *Id.* ¶¶ 65, 67; Ex. 14. By combining contraband logs with "sergeant pass-on logs" and emails, Defendants cobbled together twelve instances between January 2020 and August 2022 in which they asserted that drugs were smuggled through the mail. *See* ECF No. 117-11; ECF No. 117-12. But a close look revealed that, in *none* of those twelve instances did Defendants confirm that drugs came through the mail, either because it the substance was not identified or it was unknown if it came through the mail. Ex. 6, ¶ 65; Ex. 7, 37:3-85:12; 95:19-101:6; *see generally* Ex. 14; Ex. 15; ECF No. 117-11. Defendants often made no effort to test suspected drugs or follow up on test results. *See* Ex. 6, ¶¶ 60, 65; ECF No. 117-3, King Dep. 59:18-65:3. Indeed, several of the alleged instances of mail contraband were simply unsubstantiated reports from people at the Jail. ECF No. 117-12, PageID2137. And even after the Mail Policy was enacted, drugs continued to be found in the Jail, suggesting that mail was not the source. Ex. 6, at ¶ 69-71. Thus, Defendants cannot show as a matter of law that there was a problem with mail contraband that rationally could be addressed by the mail policy. *See Bezotte*, 2017 WL 1250683, at

10

*8 (denying summary judgment because there was a disputed issue "regarding the number of contraband and security threat incidents that have occurred at the jail").

Defendants counter that "[t]he mere risk of potential contraband coming through the mail" supports the policy. ECF 117, PageID.1184. That cannot be the case, as constitutional rights would be meaningless if they could be restricted to prevent any hypothetical harm, no matter how remote. While some courts have acknowledged that preventing future harm may provide the necessary rational connection, defendants must still produce evidence of the risk of future harm to show that a rational connection exists. *See Simpson*, 879 F.3d at 279 (discussing specific record evidence); *Pesci v. Budz*, 935 F.3d 1159, 1169 (11th Cir. 2019) (same). Notably, the defendant in *Bezotte* made the same future harm argument that Defendants make here, 2017 WL 1250683, at *6, but the court denied summary judgment, *id.* at *7. Here, as in *Bezotte*, there is a dispute of material fact as to whether there is any non-speculative threat of contraband entering the Jail through the mail that a postcard-only policy could prevent. *See also Columbia Cnty.*, 942 F. Supp. 2d at 1083-84 ("[T]he absence of an inmate mail security problem at the Jail enervates Defendants' contention that the postcard-only policy is rationally related to enhancing security.").

In fact, the Mail Policy makes the Jail and the community *less* secure. As Dr. Schriro explained, "there is no substitute for a handwritten letter. . . It is a lifeline and a keepsake, a memento that makes a material difference in the recipients' demeanor, health, and wellbeing for the duration of their detention, helps to keep the facility calm and serves as a safety net for the community upon their return home." Ex. 6, at ¶ 37;

11

*see also Procunier v. Martinez*, 416 U.S. 396, 412 (1974) ("[T]he weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances . . . the goal of rehabilitation."); *Columbia Cnty.*, 942 F. Supp. 2d at 1085 (finding that postcard-only policy "inhibit[ed] rehabilitation").

Defendants' argument that the Mail Policy is rationally connected to an interest in institutional efficiency is even less convincing. Neither Olejnik, who drafted the policy, nor DeCaussin, who recommended to the Sheriff that he approve it, cited this as a reason for the policy. ECF No. 117-4, PageID.1529, 88:4-18; Ex. 1, 76:18-77:11. Thus, Defendants cannot show that it was "the *actual* bas[i]s" for the policy. *Walker*, 917 F.2d at 386 (emphasis added). And, even if it were, the evidence shows that the time saved was *de minimis* at best. *See Columbia Cnty.*, 942 F. Supp. 2d at 1084. Both pre- and post- policy implementation, officers need to sort the mail, inspect it, copy it, and forward it to the housing units where another deputy must distribute it. ECF No. 117-4, PageID.1531-33, 90:13-92:9, ECF No. 119-17, PageID.3228-30, 42:18-44:2. Before the postcard-only policy, opening and searching mail in an envelope took about "30 seconds to a minute," ECF No. 119-17, PageID.3235, 49:6-11, and after the policy, it took about 10-15 seconds to photocopy a postcard, ECF No. 117-4, PageID.1543, 102:5-12, resulting in a savings of as little as 30 seconds per piece of mail. *See Bezotte*, 2017 WL 1250683, at *4-5 (finding genuine dispute of material fact despite testimony that postcard policy saved deputies four hours per day). And since April 2023, staff must also prepare a Mail Violation form for non-postcard mail, log it, and prepare a letter to the sender, which takes about five minutes per piece of mail. ECF No. 119-7, PageID.3237-39, 51:19-53:15. If anything then, restricting mail to

12

postcards has likely *increased* the staff time required to process mail because more mail violations occur.  Ex. 6, ¶ 75-76. Based on this evidence, a jury could conclude both that the Jail's goal was not to promote efficiency and that, if it were, the policy was not rationally connected to achieving that goal.

### B.    Alternative Means of Communication Are Not Available

A policy fails the second *Turner* factor when the alternative means of communication "are illusory, impractical, or otherwise unavailable." *Hum. Rts. Def. Ctr. v. Baxter Cnty. Ark.*, 999 F.3d 1160, 1165 (8th Cir. 2021). That is the case here. Other than postcards, people at the Jail can receive communications only through Securus's costly services. ECF No. 117 at 6. The *only* free option is one thirty-minute video call at the Jail per week per incarcerated person. *Id.* Otherwise, it costs $12.99 per 20-minute video call, and a 20-minute phone call is $4.20. Ex. 6, ¶ 110. To send eMessages, people must buy "stamps," which vary in price depending on the number of stamps purchased (the minimum is five) due to transaction fees. *Id.* at ¶¶ 106-09. In 2022, the price per "stamp" ranged from $0.56 to $1.10, and in March 2023, the price increased to as much as $1.25. *Id.* at ¶¶ 108-109. Each eMessage is limited to 2,000 characters, or about 350 words. *Id.* at ¶106. In early 2024, Securus and the Jail added Text Connect, which allows for 160-character texts directly to the phones of friends and family, for $0.10 to $0.20 per message. Ex. 16, 3-4; Ex. 17. Anyone wanting to send a long message would be forced to buy multiple "stamps" or text packages for the same number of words they would have been able to send in a letter using one postage stamp. Similarly, each photo costs one stamp, while enclosing even several photographs in a letter would have been no more expensive than the cost to send the

letter. Ex. 6, ¶107. These costs were on top of other fees, like the $5 per month fee to "rent" a tablet, ECF No, 117-5, PageID.1737, the $10 fee for Securus-provided ear buds to make calls on the tablet, Ex. 1, 286:7-287:4, and the fees for adding money to a Securus account, ECF No. 117-1, PageID.1301-03, 100:22-101:107:7. Because of these costs alone, Securus's services are not viable alternatives. *See Cnty. of Ventura*, 2014 WL 2736103, at *6 (concluding that "email is not a viable alternative" to mail because of the high cost). Although the *Simpson* court rejected similar cost-based arguments, it also explicitly noted that in-person visitation was an available alternative, and that is unavailable here. 879 F.3d at 276. Thus, this case is more like *Bezotte*, where the court found there was a genuine dispute of material fact on this factor given a ban on in-person visitation. 2017 WL 1250683, at *9.

Securus's services are also inaccessible. Video calls and eMessages require access to a computer or smart phone with an internet connection, as well as the tech savvy to create an online account and a credit card to add money to the account to pay for a message. For example, Mr. Proch's grandmother did not have the technology to contact him using the eMessaging or remote video calling services. ECF No. 117-1, PageID.1269-70, 68:10-69:2; Ex. 8, ¶ 14. And even if someone could access the required technology, communications were often of poor quality and plagued with technological issues, which were not resolved quickly. *See, e.g.*, Ex. 18; Ex. 19. Plaintiff experienced frustrating problems with freezing and lagging video calls that made them functionally useless. Ex. 8, ¶ 6. The Jail was well-aware of these issues and Securus's failure to promptly address them or provide refunds. *See, e.g.*, Ex. 18; Ex. 19.

Finally, Securus services are not adequate alternatives because they subject incarcerated people and those they communicate with to extensive surveillance. Phone and video calls are recorded and stored by Securus and can be searched and monitored by the Jail and law enforcement. *See* ECF No. 117-5, PageID. 1745, Page ID. 1755; ECF N0. 117-3, PageID.1422-23, 78:3-79:4. Text messages and eMessages are searched when they are received and then remain in a word-searchable database, which has even been used to disclose private messages to third parties pursuant to a public records request. Ex. 20, 15-22; Ex. 21; Ex. 7, 122:5-123:1. Securus also offers the Jail "investigative" tools that further encroach on people's privacy, such as Investigator Pro (IPro)—marketed by Securus as "the most powerful voice biometrics solution in the industry"—which uses voice identification technology to determine, among other things, who is speaking on a call. Ex. 9, at 19, 77-78. ECF No. 117-5, PageID. 1749-52. Although the contract states that incarcerated people must participate in a "supervised voice imprint enrollment process," in 2023 the Jail moved to "Covert Enrollment," under which people "are unaware and how enrollment occurs," making it "less likely [they] realize that their voices are being identified on their phone calls." Ex. 22 at 5.

In sum, there is at least a dispute of material fact as to the availability of alternative means of communication because the means Defendants point to "are illusory, impractical, or otherwise unavailable." *Baxter Cnty. Ark.*, 999 F.3d at 1165; *see Cnty. of Ventura*, 2014 WL 2736103, at *6 (concluding that, because "the only alternative avenues of communication are impractical or more costly, the second factor weighs against the legitimacy of the mail policy").

15

### C.   *Eliminating the Mail Policy Will Not Negatively Affect Jail Operations*

Defendants argue that "a return to regular mail would reintroduce contraband into the Jail through the mail system," and thus burden Jail operations, ECF No. 117 at 17, but, as described above, there is no evidence that there was a problem with contraband or that the old policy was ineffective at interdicting contraband. Ex. 6, ¶ ¶ 65-67; *Cnty. of Ventura*, 2014 WL 2736103, at *4 (finding no rational connection where "evidence shows that mail staff have successfully discovered and disposed of contraband that was concealed in the mail"). And the time and resource savings under the new policy is minimal at best; the new policy may even use more resources than removing the postcard-only restriction. *See* Section I(A), *supra*; *see also Turner*, 482 U.S. at 90 ("few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order"). Defendants also allude to it being "a time of high mortality from Fentanyl," ECF No. 117, at 17, but there is nothing to suggest that Fentanyl was smuggled into the Jail under the old policy, whether through the mail or other means. *See* Ex. 6, ¶ 65. Olejnik also testified he was concerned that letter mail would put correctional officers at risk of overdosing from Fentanyl hidden in the flaps of envelopes. ECF No. 117-4, PageID.1547, 106:3-16. But "there is no scientific evidence that exposure to Fentanyl or other narcotics on the skin exposes that individual to risk of harm." Ex. 6, ¶ 88. Rather than put officers at risk, a return to letter mail could promote safety because meaningful communication with the outside world improves wellbeing and decreases unrest. *Id.* at ¶¶ 37, 115-22. Thus, at a minimum, this factor "require[s] the factfinder to evaluate the facts and

how they impact Plaintiff, inmates, and the Jail and its operations." *Bezotte*, 2017 WL 1250683, at *10.

### D.     *Ready Alternatives Indicate the Mail Policy Is an Exaggerated Response*

The existence of obvious alternatives to a postcard-only policy also precludes summary judgment for Defendants. For one, Defendants can repeal the policy and continue to inspect mail manually, which many Jails do without incident. *See, e.g.*, *Columbia Cnty.*, 942 F. Supp. 2d at 1086 (rescinding postcard-only policy was an "obvious" alternative because opening manual inspection could also prevent the introduction of contraband and required little additional time to execute, and other jails had policies that allowed receiving letters); *Cnty. of Ventura*, 2014 WL 2736103, at *8 (finding that "a ready alternative to the County's outright ban on letters exists: inspecting all incoming mail for contraband"). Defendants cite no facts at all in support of their argument that returning to the old policy is not an alternative, relying exclusively on *Simpson*. ECF No. 117 at 17-18. They argue that "[t]he risk of contraband entering the facility alone is more than a *de minimis* cost, and returning to a letter mail policy would force [Defendants] to incur that cost." *Id.* (quoting *Simpson*, 879 F.3d at 282). But as described above, Defendants have not shown that there *was* a risk of contraband entering the facility under the old mail policy. Ex. 6, ¶ 67. Thus, significantly restricting mail is an "exaggerated response" to any purported concerns about contraband. *See Turner*, 482 U.S. at 90.

Moreover, the technology available for detecting concealed contraband is both varied and advanced, including "electronic mail screeners, small enough to fit on a desk and sufficiently sensitive to find traces of illicit substances between the layers of

17

paper in a business card or beneath a sticker on the envelope in a matter of seconds." Ex. 6, ¶ 84; *see* ECF No. 117-26, PageID.2426; ECF No. 117-10, PageID.2123. Defendants acknowledge that mail scanning technology is available, ECF No. 117 at 6; Ex. 10, but fail to explain why it is not a feasible alternative to restricting the rights of incarcerated people, especially given that other jails have been able to successfully adopt it. *See e.g.,* ECF No. 117-10, PageID.2123; *see Cnty. of Ventura*, 2014 WL 2736103, at *8 ("Defendants have made no showing that implementing an inspection system would impose any inordinate safety or administrative costs."). And they have not explained why they could not adopt other methods of preventing contraband from entering the Jail, like screening Jail staff and vendors, or documenting and investigating contraband incidents. *See* Ex. 6, ¶¶ 83-102. Finally, another alternative is for Defendants to ensure alternative methods of communication are available by allowing in-person visits and removing the barriers to accessing Securus's services. Thus, at minimum, there is a factual dispute as to whether the Mail Policy is an "exaggerated response" to the Jail's stated interest of reducing contraband. *See Bezotte*, 2017 WL 1250683, at *11.

### E.  *Defendants Are Due Minimal Deference*

Defendants' argument hinges on substantial deference to their judgment. But this Court's obligation to "enforce the constitutional rights of all 'persons,' including prisoners," demands that it scrutinize the reasonableness of Defendants' actions. *Cruz v. Beto*, 405 U.S. 319, 321 (1972); *see Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1162 (M.D. Ala. 2016) ("[D]eference to prison administrators' decisions regarding the management of their facilities is appropriate. But abdication of the court's role as warden

18

of the Constitution is not."). Defendants did not seriously investigate contraband at the Jail and then enacted a policy that was contrary to case law and correctional standards. Ex. 6, ¶¶ 35-40, 43. That is not the kind of "informed discretion" due any deference. *Turner*, 482 U.S. at 90. Thus, after weighing each of the *Turner* factors, a jury could very well conclude that the Mail Policy "fails to cross the threshold from a logical relationship to a reasonable one." *Baxter Cnty.*, 129 F.4th at 506.

## II.    Defendants Violated Plaintiff's Due Process Rights

"The interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment." *Procunier v. Martinez*, 416 U.S. 396, 418 (1974), *overruled in part on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989).[1] As a result, "the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards." *Id.* at 417. For incoming mail, these "minimum procedural safeguards" require that "notice of rejection be given to the inmate-recipient" and that the recipient be provided an "appeal of the rejection decision to an impartial third party prior to the letter being returned." *Martin v. Kelley*, 803 F.2d 236, 243-45 (6th Cir. 1986). Neither safeguard was provided here.

---

[1] *Thornburgh* overruled the First Amendment analysis in *Procunier* and replaced it with the *Turner* analysis. *See* 490 U.S. at 413-14. But it left untouched the due process analysis, which is still good law. *See Love v. Bigelow*, 2024 WL 4297483, at *7 (W.D. Mich. Sept. 26, 2024) (applying *Procunier* to mail due process claim).

## A. Notice

The Mail Policy does not require notice that incoming mail has been rejected. *See* ECF No. 117-7.[2] It provides only that "[a]ny incoming or outgoing mail that is refused and not accepted or mailed out will be documented," but does not say how or where. *Id.*, PageID.1769.[3] That alone establishes that the Mail Policy violates Mr. Proch's rights. In *Martin,* the Sixth Circuit held that the notice requirement had not been met where, "[a]lthough prison officials may have occasionally, or even consistently, given notice to inmates, the regulation [did] not require that notice be given." 803 F.2d at 243. If notice is not required, "censorship of protected speech can escape detection by inmates and therefore go unchallenged." *Id.* Thus, because the Mail Policy did not *require* that notice be provided, it was unconstitutional on its face.

Defendants assert that the Jail's "policy" was to issue a Mail Violation form whenever mail was rejected, citing Olejnik's affidavit stating that deputies were "required" to do so. ECF No. 117 at 9 (quoting ECF No. 117-2, 117-17); *id.* at 21. But Olejnik's statement is contradicted by the policy itself, which does *not* require that deputies issue a mail violation form when mail violates the postcard-only policy. ECF

---

[2] In April 2023, the Jail changed the mail policy to explicitly provide that a mail rule violation will be issued when mail is refused. ECF No. 117-20 at 2. On its face, this policy complies with *Martin*'s notice requirement. But, for the reasons described below, it still does not provide an adequate opportunity to appeal. And because the change occurred after Plaintiff's release, it does not preclude summary judgment here.
[3] The Mail Policy mentions the Mail Violation form only in a section regarding "material which is determined to be a threat to institutional safety and security," which it defines in a list that does not include non-postcard mail. ECF No. 117-7, PageID.1770. If anything, by providing for specific instances when Mail Violation forms must be used, the policy suggests that the forms do not need to be used for non-postcard mail.

20

No. 117-7; *see also* ECF No. 119-17, PageID.3225, 39:18-21 (practice is consistent with written policy). It is also contradicted by Olejnik's own testimony that he does not know how often mail violation forms were used. ECF No. 117-4, PageID.1610-11, 169:21-170:8. And it is contradicted by Plaintiff's experience. Plaintiff never received any Mail Violation forms during his incarceration. Ex. 8, ¶ 13; ECF No. 117-4, PageID.1612, 171:5-17; PageID.1618,177:4-8. Yet, he is aware of at least three items he never received: a letter from his partner's aunt and at least one letter and a magazine subscription from his brother. Ex. 23, ¶ 3, Ex. A; Ex. 24 ¶¶ 3-6, Ex. 8, ¶ 12; ECF No. 117-1, PageID.1235-36, 34:20-35:3; PageID.1236-37,35:22-36:2. And Plaintiff also never received responses to requests he sent to educational institutions about correspondence courses, suggesting that they were also returned. Ex. 8, ¶ 10; ECF No. 117-1, PageID.1263-64, 62:13-63:6. That Plaintiff did not receive notice about *any* of this mail strongly supports a finding that the County did not require notice when mail was rejected. And, at the least, it shows that Plaintiff himself was not given notice.

Indeed, despite Plaintiff's repeated requests, Defendants were able to produce only a handful of Mail Violation forms issued to other people between August 2022 and April 2023, and they could not confirm how many Mail Violation forms were issued or how many pieces of mail were rejected during that period. ECF No. 117-18; ECF No. 119-17, PageID.3241, 55:3-9; PageID.3247, 61:16-20; ECF No. 117-4, PageID.1636-37, 195:15-196:13. When pressed, neither Lieutenant was able to point to any specific Mail Violation forms that exist other than the ones produced. ECF No. 119-17, PageID.3246, 60:22-23; ECF No. 117-4, PageID.1637, 196:7-13. In short, Defendants have not shown as a matter of law that, despite no written policy requiring

21

notice, and despite at least several instances of Plaintiff not receiving notice, it in fact had a practice of providing notice. That precludes summary judgment.

Finally, the 2022 Mail Policy was unconstitutional for another reason: it did not require any notice to the sender. *See* ECF No. 117-7.[4] Due process requires that notice be provided to "the author of the rejected letter" in addition to the incarcerated recipient. *Martin*, 803 F.2d at 243-44. As the Sixth Circuit explained, not only does the author need notice to exercise their *own* right to challenge the decision, but notice to the sender also implicates the incarcerated recipient's due process rights: "since the inmate-recipient would not have seen the contents of the withheld letter, he may require the aid of the author to meaningfully challenge the rejection decision." *Id.* at 244. As a result, *Martin* held that a mail policy was unconstitutional in part because it provided no notice to the sender, even though the claim in that case was brought by the incarcerated recipient. *See id.* at 236, 243-44.[5] It is thus not surprising that Defendants later began providing notice to senders; the lack of notice was plainly unconstitutional. ECF No. 117-4, PageID.1603, 162:3-9; ECF No. 119-17, PageID.3237, 51:3-18.

### B. *Opportunity to Be Heard*

Defendants assert that "the only procedure required to the inmate is a notice." ECF No. 117 at 23. But, under *Martin*, the Mail Policy must also "provide for an

---

[4] Indeed, for many months after the policy went into effect, if members of the public called the Jail seeking information about how to send mail to their loved ones, the recording told them they could send letters in envelopes and did not notify them about the new postcard-only policy. *See* Ex. 25.

[5] Given this reasoning, the decisions cited by Defendants holding that incarcerated people lack standing to raise claims on behalf of the senders of mail, *see* ECF No. 117 at 21-22 n.4, are inapposite because Plaintiff's own rights were violated.

appeal of the rejection decision to an impartial third party prior to the letter being returned." 803 F.2d at 244. It does not. Neither the Mail Policy itself nor the Mail Violation form Defendants purportedly used mention anything about a right to appeal. *See* ECF No. 117-7; ECF No. 117-17. Instead, Defendants contend that Mr. Proch "had access to the grievance process to challenge that decision, just like he could challenge any other jail decision." ECF No. 117 at 21. But *Martin* rejected a similar general grievance process as inadequate because "the letter would be returned to the sender before the grievance would be resolved, or even filed." 803 F.2d at 244. Here, Olejnik acknowledged that under the policy in effect from August 2022 to April 2023, the mail would be "long gone" before the incarcerated recipient had a chance to go through the grievance process. ECF No. 117-4, PageID.1608-09, 167:5-168:3. As in *Martin*, "there [was] no requirement that the letter be saved pending grievance procedures." 803 F.2d at 244. Instead, the deputy processing the mail could "make a unilateral decision to return a letter to the sender, apparently on-the-spot." *Id.* That procedure was "inadequate" because "procedural safeguards should be designed to prevent unjustified censorship, not merely to provide a remedy for an aggrieved inmate." *Id.*

Although the policy was changed in April 2023 to give more time for the *sender* of the mail to contest the decision before the mail was returned, that was still inadequate. The new policy requires that a Lieutenant notify the sender that the mail was refused and then wait 5 business days for a response before returning the mail. ECF No. 117-20; ECF No. 119-17, PageID.3238-39, 52:20-53:10; ECF No. 117-4, PageID.1621-22, 180:6-181:1; PageID.1623-24, 181:20-182:3. But there is still no "requirement that the letter be saved pending grievance procedures." *Martin*, 803 F.2d

23

at 244; ECF No. 119-17, PageID.3239, 53:16-23. Thus, even after April 2023, the Mail Policy fails to provide the required minimum procedural safeguards.

Defendants argue that *"Procunier, Martin,* and *ACLU Fund of Mich. v. Livingston Cnty.* are distinguishable from the present case because those rejections were based upon the content of the mail, not the form of the mail." ECF No. 117 at 22. They do not explain why that distinction is relevant. Regardless of the reason, the mail is still "withh[e]ld" and thus the recipient is entitled to procedural safeguards. *Procunier,* 416 U.S. at 417-18. In fact, *ACLU Fund* involved letters that were rejected under a postcard-only policy. *ACLU Fund of Mich. v. Livingston Cnty.,* 796 F.3d 636, 639-40 (6th Cir. 2015). And other courts in the Sixth Circuit have routinely applied *Procunier* to form-based, rather than content-based restrictions. *See, e.g., Bezotte,* 2017 WL 1250683, at *12-13 (postcard-only policy); *Langford v. Kienitz,* No. 22-CV-00152, 2024 WL 5456309, at *3 (W.D. Mich. Oct. 25, 2024) (destruction of documents for failure to comply with contraband policy).

The cases cited by Defendants do not support their rule that form-based rejections do not implicate due process rights. In *Witzke v. Bouchard,* the court rejected a due process claim for denial of access to a jail's electronic communications system to someone outside the jail, concluding that he did not have "a constitutionally protected interest in access to" the platform. 2023 WL 3919303, at *11 (E.D. Mich. June 9, 2023). That the non-incarcerated plaintiff there did not have a liberty interest in accessing a particular platform has no bearing on the fact that Plaintiff clearly has a protected liberty interest in receiving mail. *See Procunier,* 416 U.S. at 418. Likewise, the out-of-circuit cases Defendants cite do not support their contention that there are no

24

due process requirements when mail is withheld based on its form.[6] In short, *Martin* established that Plaintiff was entitled to notice that his mail was withheld and an opportunity to challenge it. He was provided neither.

## III. A Jury Could Reasonably Find That Defendants Retaliated Against Plaintiff

To prove retaliation, Plaintiff must show that he (1) "engaged in protected conduct"; (2) "an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct"; and (3) "the adverse action was motivated at least in part by [his] protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). Defendants focus their arguments exclusively on the "adverse action" and causation prongs.

### A. Threatening to File a Lawsuit was an Adverse Action

Defendants completely ignore the adverse action that is central to Plaintiff's retaliation claim: the threat to sue him for nearly $14,000. ECF No. 117 at 23. They do so despite Plaintiff clearly relying on that action in the briefing on his Motion for Leave to Amend and this Court holding based on that briefing that Plaintiff had alleged "sufficiently adverse actions." ECF No. 79 at 3; ECF No. 81 at 11-12. Thus, Defendants have waived their right to move for summary judgment on the basis that the threat to

---

[6] *See Bratcher v. Clarke*, 2018 WL 4658684, at \*15 (E.D. Va. Sept. 26, 2018) (agreeing that under *Procunier* the plaintiff was entitled to procedural safeguards "when a prison official decides 'to censor or withhold delivery of a particular letter,'" but holding that there was no deprivation where plaintiff still received photocopies), *vacated by* 770 F. App'x 105 (4th Cir. 2019); *Banks v. Kelley*, 2021 WL 1939671, at \*7 (E.D. Ark. Apr. 22, 2021) ("Prisoners and their correspondents do have a liberty interest in 'uncensored communication by letter,'" but regulation limiting letters to three-pages did not on its face interfere with that interest).

sue was not an adverse action. But even if they haven't, a jury could find that the threat Plaintiff was an adverse action both on its own and as part of "an entire campaign" of adverse actions which, taken together, "would likely chill a person of ordinary firmness from continuing to engage in [protected] activity." *Thaddeus-X*, 175 F.3d at 394, 398 (actions that were individually "trivial in detail" still "may have been substantial in gross" to establish retaliation claim (quotation omitted)).

As this Court explained, the threshold in the Sixth Circuit for an action to rise to the level of retaliation under the First Amendment is not high. ECF No. 81 at 11-12. "[B]ecause 'there is no justification for harassing people for exercising their constitutional rights,' the deterrent effect of the adverse action need not be great in order to be actionable." *Hill v. Lappin*, 630 F.3d 468, 473 (6th Cir. 2010) (quoting *Thaddeus-X*, 175 F.3d at 397). That is particularly true at the summary judgment stage: "this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Thaddeus-X*, 175 F.3d at 398. Indeed, "[w]hether action is sufficiently adverse to deter a person of ordinary firmness is generally a question of fact and thus reserved for the jury." *King v. Williams*, 2013 WL 4718335, at *3 (E.D. Mich. Sept. 3, 2013) (citing *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002)).

Moreover, "threats alone can constitute an adverse action." *Hill*, 630 F.3d at 474; *see Pasley v. Conerly*, 345 F. App'x 981, 985 (6th Cir. 2009). That includes threats to file a lawsuit. *See Arnold v. Batts*, 2023 WL 6690931, at *2-3 (M.D. Tenn. Oct. 12, 2023) (holding that an officer's threat to an incarcerated person that when people filed lawsuits against him "he sued the people back and took their families[']

assets" could be an adverse action). Here, after Mr. Proch exercised his First Amendment rights by filing grievances, filing this lawsuit, and contesting his debt, the County responded with a threat to sue him for nearly $14,000. ECF No. 117-23, PageID.2436-38. A jury could find that the "threat to sue your family and take their money . . . would likely have a strong deterrent effect," *Arnold*, 2023 WL 6690931, at *3, particularly when combined with Defendants' actions to interfere with this lawsuit, *see* ECF No. 117-15, PageID.2221-22, 2228-29, 2241-42.

### B.   The Adverse Action Was Motivated by Protected Activity

A jury could reasonably conclude that the threat to sue Mr. Proch was "motivated at least in part" by his protected activity. *Thaddeus-X*, 175 F.3d at 394. First, it was made in direct response to Mr. Proch's protected First Amendment activity in sending a letter to the County—after his incarceration—raising concerns about the debt they were trying to collect.[7] *See, e.g., Arnold*, 2023 WL 6690031, at *3 (finding causation plausible where threat was made in direct response to protected activity). Second, the threat was approved by County officials, including counsel, who were well-aware of this lawsuit and Mr. Proch's grievances and had discussed them with each other. Roy drafted the letter and then sent it to DeCaussin, who reviewed it, with advice from counsel. ECF No. 117-22, PageID.2309-10, 17:17-18:2; 92:3-17. The letter was sent on King's letterhead. ECF No. 117-23, PageID.2438. And King testified that

---

[7] Defendants do not dispute that this was protected speech. But to the extent that is disputed, criticizing County officials is clearly protected. *See McElhaney v. Williams*, 81 F.4th 550, 557 (6th Cir. 2023) ("[O]ther than in a few limited areas, almost all speech is protected from governmental interference." (cleaned up)), *cert. denied*, 144 S. Ct. 696 (2024).

he and DeCaussin had "spoken about the lawsuit [e]ver since it came in, obviously." ECF No. 117-3, PageID.1358, 14:9-10; 14:14-16; *see also* Ex. 1, 16:11-17:1. King testified that he was made aware of Mr. Proch's grievances "in conversation" with DeCaussin and one of the Lieutenants before this suit was filed because he "was advised that an individual was down there writing grievances constantly." ECF No. 117-3, PageID.1431, 87:13—16; PageID.1435, 91:19-2 (they wanted to make him aware "that this individual seemed to have a grievance for everything that happened in the jail)"; PageID.1437, 93:13-16 ("he was writing long, long, long letters instead of just stating his grievance"). When asked why he would want to know if someone was filing a lot of grievances, he responded, "well, here we are sitting in a lawsuit," and characterized Mr. Proch's grievances as "out of the ordinary." ECF No. 117-3, PageID.1435-36, 91:24-92:6; PageID.1436, 92:10-11. Given these statements, a jury could find that King and DeCaussin, who were responsible for approving the threatening letter, were aware that Plaintiff had filed grievances and a lawsuit and viewed him as a nuisance.

Further evidence that the threat was motivated by Mr. Proch's protected activity is that no threat to sue was made to other people who had recently been released but had not paid their debts. *See Hill*, 630 F.3d at 475 (circumstantial evidence of causation "can include disparate treatment of similarly situated individuals"). Indeed, the County's policy was to not send debts to collections until they were more than 90 days past due and to not file a lawsuit until the collection agency had made multiple collection attempts and recommended a suit be authorized. *See* ECF No. 117-22, PageID.2348, 56:7-10; PageID.2361, 69:1-4; PageID.2368, 76:1-14. Roy testified that filing a lawsuit to collect a debt was "fairly rare." *Id.*, PageID.2369, 77:11-21. She was

right: the County filed only three lawsuits to collect debts in all of 2022 and 2023. *See* Ex. 11. Here, Mr. Proch was first billed on March 27, 2023, and his payment was due on April 22. ECF No. 117-23, PageID.2437. So when the threat to sue was made on May 25, his payment was barely 30 days past due and had not been sent to collections. ECF No. 117-23, PageID.2438. Defendants have pointed to no instances in which the County sued someone under those circumstances. ECF No. 117-22, PageID.2383, 91:6-9. To the contrary, the three lawsuits the County filed all involved debts where more than *a year* had passed since the person was released. Ex. 11 at 7-16.

Defendants also renew the argument—that this Court already rejected, ECF No. 81 at 11-12—that an action must "lack[] a reasonable basis in law or in fact" to be actionable retaliation. ECF No. 117 at 25. The cases Defendants cite involving employment statutes, *see* ECF No. 117 at 25, do not support such a rule in the First Amendment context, where, as this Court explained, the standard for an adverse action is broader. *See* ECF No. 81 at 11. In any event, the threat to sue did not have a reasonable basis. First, as described above, the County did not send debts to collections that were less than 90 days past due, let alone sue. ECF No. 117-22, PageID.2348, 56:7-10; PageID.2361, 69:1-4. Second, the County has an affirmative duty to "investigate the financial status of the prisoner" before collecting a debt. *Mudge v. Macomb Cnty.*, 534 N.W.2d 539, 542 (Mich. Ct. App. 1995), *aff'd in part*, 580 N.W.2d 845 (Mich. 1998); *see also* Mich. Comp. Laws §§ 801.83(3), 801.84. Yet, it failed to do so before threatening to sue. The form from when Plaintiff was booked in May 2022 does not fulfill this requirement, as it could not have provided his post-incarceration financial status or ability to pay the debt in May 2023. ECF No. 117-23, PageID.2440.

29

## IV.    Each Defendant Is Liable for These Constitutional Violations

*St. Clair County.* Defendants do not dispute that King in his official capacity, and, by extension, the County, can held be liable for "officially adopt[ing] and promulgat[ing]" the Mail Policy. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *see* ECF No. 117 at 11-19. And they acknowledge that Plaintiff's due process claim "is a 'policy' claim" for which the County is liable under *Monell*. ECF No. 117 at 19; *see also Rieves v. Town of Smyrna*, 67 F.4th 856, 865 (6th Cir. 2023) ( "[T]he County is generally liable for the acts and decisions made by [the Sheriff] in his capacity as the final decisionmaker for [the Sheriff's Office].");  *Marchese v. Lucas*, 758 F.2d 181, 189 (6th Cir. 1985) (affirming jury verdict finding a county and its sheriff jointly liable under Section 1983). Defendants dispute only the County's liability for retaliation, arguing that it is not liable because "there is no *respondeat superior* liability under Section 1983." ECF No. 117 at 23. That misstates Plaintiff's argument. As *Monell* made clear, a county and its employees in their official capacities may be held liable for actions taken "by those whose edicts or acts may fairly be said to represent official policy." 436 U.S. at 694. Here, King and employees acting on his behalf—well-aware of Mr. Proch's protected activity—retaliated against him by threatening that "[t]he County" would sue him. *See* Section III, *supra*. That is certainly an act that "may fairly be said to represent official policy" to establish *Monell* liability.

*Individual Defendants.* Mr. Proch has established that each individual Defendant took actions that violate his First and Fourteenth Amendment rights. First, the idea to implement a postcard-only restriction came from Olejnik and Adams, who discussed with Decaussin and King the idea for updating the mail policy, then drafted the

30

policy language for review. Ex. 1, 77:12-22; ECF No. 117-4, PageID.1527, 86:9-11. King then approved the policy, ECF No. 117-3, PageID.1390, 46:1-3, which was largely the same as what Olejnik and Adams had originally drafted. Ex. 1, 78:7-10. Thus, the individual defendants are personally liable for the policy's unconstitutional restrictions on the First Amendment and Due Process rights of people at the Jail. *See Artis v. Ingham Cnty. Jail*, No. 17-CV-516, 2017 WL 5380898, at *6 (W.D. Mich. Nov. 14, 2017) ("[D]rafting the policy is the sort of authorization, approval, or acquiescence in the unconstitutional conduct that supports the imposition of liability.").

Second, the individual defendants were responsible for overseeing the implementation of the policy. ECF No. 117-3, PageID.1392, 48:10-19; ECF No. 117-4, PageID.1478, 37:8-20; ECF No. 119-17, PageID.3199, 13:2-8. But aside from sharing the new policy—which did not require notice—they took no other steps to provide training regarding how to implement the policy. ECF No. 117-4, PageID.1611-12, 170:15-171:4. Indeed, the mail was processed outside of their working hours, so they were "not able to oversee that." *Id.* 170:20-171:1. The lack of training was compounded by the fact that mail could be processed by "anybody that's on duty that day." ECF No. 117-4, PageID.1532, 91:15-16; Ex. 6, ¶¶ 78-79 (lack of assigned deputy "likely explains why deputies failed to consistently fill out mail violation notices for inmates whose incoming mail was returned"). Thus, the Lieutenants are individually liable for the inadequate due process, whether because of the policy they drafted or because they failed to train deputies to ensure they consistently provided notice.

Finally, King is also individually liable for Mr. Proch's retaliation claim. The threat to sue Mr. Proch was sent on behalf of King, from his office. *See* ECF No. 117-

31

23, PageID.2438. Particularly given that his direct report—DeCaussin—reviewed and discussed the letter with counsel before it was sent, and given King's conversations with Decaussin about Mr. Proch's grievances and lawsuit, a jury could reasonably infer that King personally authorized the letter to be sent on his behalf. *See* Section III, *supra*.

## V. The Individual Defendants are not Entitled to Qualified Immunity

Qualified immunity does not protect individuals who act contrary to "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether a right was clearly established, the Sixth Circuit employs "a more reasonable, common sense approach," which acknowledges that, while each factual scenario is different, "they are not so different that courts and public officials cannot intuit the contours of the rights at issue." *Cochran v. Gilliam*, 656 F.3d 300, 310 (6th Cir. 2011). Thus, officials "can still be on notice that their conduct violates established law even in novel factual circumstances," and prior cases need not be "fundamentally similar" to the facts at hand to put defendants on notice. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "Instead, the 'salient question' is whether 'the state of the law' gives defendants 'fair warning' that their actions are unconstitutional." *MacIntosh v. Clous*, 69 F.4th 309, 319 (6th Cir. 2023) (quoting *Hope*, 536 U.S. at 741).

*First Amendment.* It is "clearly established" that incarcerated people "retain their First Amendment right to receive mail, . . . subject to legitimate penological in-terests." *Sheets v. Moore*, 97 F.3d 164, 166 (6th Cir. 1996). And given the law in the

Sixth Circuit, Defendants had "fair warning" that limiting incoming mail to only post-cards under these circumstances was unconstitutional because it was *not* rationally related to a legitimate penological interest. *See Turner*, 482 U.S. at 89-91; Section I, *infra*; *Bezotte*, 2017 WL 1250683, at *11 (denying summary judgment on constitutional challenge to postcard-only policy); *Johnson v. Wickersham*, No. 13-CV-13672, 2014 WL 4905285, at *4 (E.D. Mich. Sept. 10, 2014) (holding that restricting incoming mail to a postcard likely violated the First Amendment), *report and recommendation adopted*, 2014 WL 4897433 (E.D. Mich. Sept. 30, 2014). Indeed, the Mail Policy was contrary to the very correctional industry standards cited in it, which are based on case law regarding the rights of incarcerated people. Ex. 6 ¶¶ 38-40. Accordingly, Defendants are not entitled to qualified immunity for their implementation of a postcard-only restriction not rationally related to a legitimate penological interest.

**Due Process.** Defendants do not argue that they are entitled to qualified immunity for their due process violations. ECF No. 117 at 28. Nor could they: the Supreme Court established as early as 1974 that "uncensored communication by letter" is "plainly a 'liberty' interest within the meaning of the Fourteenth Amendment" and that, as a result, "the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards." *Procunier*, 416 U.S. at 417-18. And since 1986, the law in the Sixth Circuit has been that those safeguards include "notice of [the] rejection" and "an appeal of the rejection decision to an impartial third party prior to the letter being returned." *Martin*, 803 F.2d at 243-45. Thus, Defendants are not entitled to qualified immunity for failure to provide those safeguards.

***Retaliation.*** "The law is well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional." *Zilich v. Longo*, 34 F.3d 359, 365 (6th Cir. 1994); *see also Barton v. Neeley*, 114 F.4th 581, 591 (6th Cir. 2024) ("[I]t is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983."). Specifically, as described above, it is clearly established that threats alone can constitute retaliation. *See Hill*, 630 F.3d at 474; *Thaddeus-X*, 175 F.3d at 398; *Pasley*, 345 F. App'x at 985; *Smith v. Yarrow*, 78 F. App'x 529, 543 (6th Cir. 2003); *see also Wells v. Rice*, 692 F. Supp. 3d 735, 747-48 (E.D. Ky. 2023). As a result, King had "fair warning" that threatening to sue Mr. Proch for exercising his First Amendment rights was retaliation.

## VI.    Plaintiff's Claims for Injunctive and Declaratory Relief Are Not Moot

Defendants argue that Mr. Proch's claims for declaratory relief are moot "for the same reason this Court found that his claim for injunctive relief was moot." ECF No. 117 at 28. But as Mr. Proch has explained, this Court recommended denying Mr. Proch's injunctive relief claims as moot because it had recommended denying his motion for class certification. ECF No. 37 at 11-12. Now, the Court has set a new deadline for Mr. Proch to move for class certification, so that previous ruling is not controlling. Instead, Mr. Proch's claims for injunctive and declaratory relief should be allowed to move forward under the "inherently transitory" exception to mootness, which applies when the named plaintiff in a class action is unlikely to be subject to a challenged policy long enough for a court to rule on class certification. *See Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975). In such cases, "the termination of a class representative's claim does not moot the claims of the unnamed members of the class." *Id.*

Here, as explained in *Gerstein*, the injury suffered by Mr. Proch and members of the putative class is transitory: The length of their detention is inherently temporary and unpredictable "and it may be ended at any time." *Id.* at 110 n.11; *see also Olson v. Brown*, 594 F.3d 577, 582 (7th Cir. 2010) ("[T]he length of incarceration in a county jail generally cannot be determined at the outset and is subject to a number of unpredictable factors, thereby making it inherently transitory."). Indeed, Mr. Proch filed his complaint and moved for class certification while he was incarcerated, but he was released before the Court could rule. ECF No. 62 at 3. Meanwhile, the Mail Policy continues in effect, so it is certain that class members will continue to suffer the same injury, and they will be unable to vindicate their rights as a class if the claims for prospective relief are always mooted before the Court can rule on class certification.[8]

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court deny Defendants' Motion for Summary Judgment.

Date: April 4, 2025                                     Respectfully submitted,

                                                      */s/ Shelby Leighton*
                                                      Shelby Leighton
                                                      Jaqueline Aranda Osorno
                                                      PUBLIC JUSTICE
                                                      1620 L St. NW, Suite 630
                                                      Washington, DC 20036
                                                      (202) 797-8600
                                                      sleighton@publicjustice.net
                                                      jaosorno@publicjustice.net

---

[8] Because Securus has been dismissed from this case based on Plaintiff's failure to state a conspiracy claim against it, ECF No. 124, Plaintiff does not pursue his claim for conspiracy here. But Plaintiff reserves the right to challenge that dismissal.

Ian T. Cross
Cross Law PLLC
402 W Liberty St.
Ann Arbor, MI 48103
734-994-9590
Email: ian@lawinannarbor.com

*Counsel for Plaintiff*

36

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

Dated: April 4, 2025                    */s/ Shelby Leighton*
                                         Shelby Leighton

                                         *Counsel for Plaintiff*