## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TAUREAN PROCH,

     *Plaintiff*,

*v.*

MAT KING, D. FLEMING,[1]
R. OLEJINK, K. ADAMS, and
ST. CLAIR COUNTY,

     *Defendants*.

_____/

Case No. 2:22-cv-12141

Hon. Laurie J. Michelson
United States District Judge

Hon. Patricia T. Morris
United States Magistrate Judge

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT (ECF No. 117)

## I.    RECOMMENDATION

For the following reasons, **I RECOMMEND** that this Court **DENY** Defendants' motion for summary judgment as to Plaintiff Taurean Proch's Due Process claim as well as his demand for declaratory relief, and **GRANT** Defendants' motion as to all remaining claims. (ECF No. 117). If adopted, the Undersigned would then certify completion of pretrial proceedings and return the case to the Court for trial.

---

[1] D. Fleming was not named as a defendant in the operative complaint, *i.e.*, the Amended Complaint, which is docketed as entry no. 89. Accordingly, the Court should terminate D. Fleming as a defendant on the docket.

## II.    <u>REPORT</u>

### A.    Background

Taurean Proch is a former inmate of the St. Clair County Jail ("the Jail"). Proch's incarceration resulted from his May 2022 conviction on state criminal charges for which he was sentenced to a one-year term of imprisonment in jail followed by a two-year term of probation.  (ECF No. 53-2, PageID.437–38; *see also* ECF No. 38-3, PageID.325, ¶ 4).  Proch was sent to the Jail to serve the custodial portion of his sentence. (ECF No. 1, PageID.1).

Soon after Proch arrived at the Jail, officials instituted a "postcard-only" policy which limited the type of personal mail inmates could receive to postcards only.  (*Id.* at PageID.4–5, ¶ 12).  According to Proch, officials would either destroy or return nonconforming mail without notifying the intended recipient.  (*Id.* at PageID.5, ¶ 13).

While still imprisoned, Proch, then proceeding *pro se*, filed this putative class action under 42 U.S.C. § 1983, alleging that the Jail's policy violated his First and Fourteenth Amendment rights.  (*Id.* at PageID.20–21, ¶¶ 45–50).  Proch was released on probation in January 2023.  (ECF No. 34, PageID.249; ECF No. 36, PageID.256; ECF No. 38-2, PageID.322; ECF No. 38-3, PageID.325, ¶ 4–5).  Proch has since obtained counsel and filed an Amended Complaint.  (*See* ECF Nos. 66–67, 82–89).

Proch's Amended Complaint alleges that Defendants instituted a mail policy

that infringed on his and his fellow inmates' First and Fourteenth Amendment rights and then that Defendants retaliated against Proch for bringing this action.  (*See* ECF No. 89).  Proch alleges that "[t]he purpose of the change to the mail policy was to make money for Securus [Technologies ("Securus")] and the Jail, not to serve any legitimate penological purpose."  (*Id.* at PageID.891).  At this time, the remaining Defendants are St. Clair County ("the County") and the following three individuals: (1) Mat King (Sheriff of the County); (2) Richard Olejnik (a lieutenant for the Sheriff's Department); and (3) Kyle Adams (a lieutenant for the Sheriff's Department).  (*Id.* at PageID.892–94).

Securus is a private company that provides communications services to "3,400" correctional facilities in every state including facilities in at least sixty-seven counties in Michigan.  (*Id.* at PageID.894, ¶ 17).  Beginning in 2017, the County contracted with Securus to sell the ability to make phone and video calls to the Jail's inmates.  (*Id.* at PageID.890, ¶ 3).

Three years later, Securus and the County "amended their contract" in a way that overhauled the Jail's system for how inmates could communicate both inside the Jail and to anyone outside of the Jail.  The contract outlined how Securus would provide the Jail with "digital tablets" that would allow inmates to "make calls and send messages" to family and friends.  The tablets would also "bec[o]me the exclusive" means for inmates to "order items from the commissary, file grievances,

request medical care, or access legal research materials." (*Id.* at PageID.890, ¶ 4).

Securus paid the County a commission in exchange for access to its inmate population. Inmates could rent tablets for $5 per month in addition to a $7.50 fee "to access the tablet's applications." (*Id.* at PageID.900, ¶ 45). To send or receive photos or text messages, Securus required users to purchase electronic "stamps" in advance. (*Id.* at PageID.901, ¶ 49). Securus charged fifty cents per stamp, with a $3.75 transaction fee for every purchase. (*Id.* at PageID.901, ¶¶ 49–50). Each stamp could be redeemed to send a single photo, video, or 2,000-character message. (*Id.* at PageID.901–02, ¶¶ 49, 51). Securus charged twenty-one cents per minute for phone calls and $13 for each twenty-minute video call. (*Id.* at PageID.890, ¶ 3). And to use either feature, inmates first had to purchase a pair of headphones from Securus. (*Id.* at PageID.903, ¶ 56). The Jail earned a 20% commission from the sale of every stamp, a 78% commission for each phone call, a 10% commission on tablet subscriptions, and a 50% commission for each video call. (*Id.* at PageID.890, 900, ¶¶ 3, 45).

Two years after commencing Securus's tablet service, the Jail implemented a "postcard-only" mail policy. (ECF No. 89, at PageID.897, ¶¶ 31–32). Under this rule, the Jail requires all incoming, "general" correspondence to be confined to a "plain postcard"—one that has no embellishments such as "glitter, stickers, or glued items." (*Id.*; ECF No. 117-7, PageID.1769). The Jail places "no limit on the volume

of mail an inmate may send or receive . . ., except where there is . . . clear and convincing evidence" of a threat to jail "security."  (ECF No. 117-7, PageID.1769).

The policy does not apply to what the Jail calls "special correspondence." (ECF No. 117-7, PageID.1771).  Letters from private attorneys, courts, government lawyers, and "representatives of the news media" are all exempt from the postcard policy—provided that their exempt status is "unambiguously" apparent from the "envelope."  (*Id.*)  Likewise, the postcard policy does not prevent inmates from receiving magazines, newspapers, soft-covered books, or periodic publications.  (*Id.* at PageID.330–31).

When the Jail receives a postcard, it photocopies the front and back, disposes of the original, and delivers the photocopied version to the addressee.  (*Id.* at PageID.330).  The policy requires the Jail to "refuse[], return[], or destroy[]" nonconforming general mail.  (ECF No. 89, PageID.898, ¶ 35).  Although it also requires officials to "notify" the intended recipient with a "'mail violation' form," the policy "provides no procedure" for inmates "to contest" the Jail's "determination."  (*Id*. at PageID.898–99, ¶¶ 36, 40).

Proch was incarcerated at the Jail when this policy went into effect.  He alleges that the policy prevented him from (1) receiving letters from his romantic partner containing "photos of his children or artwork by his children," (2) "participating in an educational correspondence course," (3) "obtaining legal research materials and

religious materials from sources outside the jail," (4) receiving letters "from anyone unaware of the [J]ail's" postcard policy, and (5) "signing important documents." (*Id.* at PageID.897–98, ¶ 34).   Proch further claims that he was not notified when the Jail rejected his incoming mail.  (*Id.* at PageID.898, ¶¶ 36–39).  Proch believes that the County only implemented the postcard policy to increase its commission revenue by forcing inmates to use Securus's tablets.  (*Id.* at PageID.899, ¶ 42).His remaining claims are that the County and the individual defendants violated his rights to free speech and due process by implementing the postcard policy and rejecting nonconforming mail without notice.  (ECF No. 82, PageID.791–94; ECF No. 89, PageID.929–32).

Before the Court is the County and individual defendants' joint motion for summary judgment.  (ECF No. 117).  This motion is fully briefed (ECF Nos. 129, 132), and ready for consideration.

### B.    Legal Standard

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that would affect "the outcome of the suit under the governing law. . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether

there . . . are any genuine factual issues that properly can be resolved only by a finder of fact. . . ." *Id.* at 249–50, 255.  Accordingly, "the evidence, all facts, and any inferences that may be drawn from the facts" must be viewed "in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).  The nonmoving party cannot rebut a Rule 56 motion by merely alleging that a genuine factual dispute exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986) (quoting Fed. R. Civ. P. 56(e)).  Instead, the nonmoving party must show that there is sufficient evidence in the record for "a reasonable finder of fact [to] find in its favor." *Anderson*, 477 U.S. at 248.

## C.  Analysis

### 1.  Constitutionality of Postcard Policy

In Count 1 of his Amended Complaint, Proch alleges that Defendants "conspired to violate that right when they enacted the Mail Policy, which is not connected to any legitimate penological interest, to intentionally drive business to Securus's services and increase revenue for Securus and the Jail." (ECF No. 89, PageID.929).  The parties appear to agree that the primary dispositive authority in this case was announced in *Turner v. Safley*, 482 U.S. 78, 95 (1987) ("[A] prison inmate retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). (*See* ECF No. 117, PageID.1183–84; ECF No. 129, PageID.3537–38).  Under

*Turner*, several factors are relevant in determining the reasonableness of the regulation at issue, including 1) whether a "valid, rational connection" exists between the prison regulation and the legitimate governmental interest put forward to justify it; 2) the existence of an alternative means for inmates to exercise their constitutional right; 3) the impact that accommodation of the constitutional right will have on guards and other inmates, and on the allocation of prison resources; and 4) the absence of ready alternatives as evidence of the reasonableness of a prison regulation.  *Turner*, 482 U.S. at 89–90.  The parties simply disagree whether the communication policy at the Jail meets the *Turner* factors.  Each will be analyzed in turn.

As to the first *Turner* factor, Defendants argue that "the jail mail policy easily meets the *Turner* standard."  (ECF No. 117, PageID.1184).  Specifically, they argue that "reducing the risk of contraband coming through the mail and reducing the time necessary to process incoming mail—are clearly legitimate penological objectives." (*Id.*).  Proch argues in response that "the actual reason the Mail Policy was enacted was to generate revenue by extracting money from incarcerated people and their families."  (ECF No. 129, PageID.3538).  It is undisputed that in the two years leading up to this policy, there were no less than "twelve instances between January 2020 and August 2022 in which [the Jail] asserted that drugs were smuggled through the mail." (*Id.* at PageID.3540).  Although Proch takes issue with the extent, nature,

and subsequent investigations of these instances, there is no dispute that drugs find

their way into this Jail and many others around the country, and that prisoner mail is

a known vector for drug movement.  *See, e.g.*, *Block v. Rutherford*, 468 U.S. 576,

588–89 (1984) ("We can take judicial notice that the unauthorized use of narcotics

is a problem that plagues virtually every penal and detention center in the country.").

The Undersigned has previously touched on this issue, *i.e.*, the likelihood of

success on the merits of this First Amendment challenge, stating in pertinent part:

> Defendants will almost certainly establish a commonsense connection
> between the postcard-only policy and its legitimate objectives in
> security and efface.  To be sure, Proch may provide evidence to rebut
> this commonsense connection.  Yet, despite carrying the burden of
> establishing that a preliminary injunction is clearly warranted, Proch
> provided the Court with no evidence that would cast this commonsense
> connection into doubt.

*Proch v. King*, No. 2:22-CV-12141, 2023 WL 11829097, at *8 (E.D. Mich. Jan. 24,

2023) (cleaned up), *report and recommendation adopted*, 2023 WL 11830000 (E.D.

Mich. Mar. 27, 2023).

In response, Proch argues that the stated rationale of limiting an avenue of

contraband is pretext for a financial motivation, *i.e.*, that limiting jail mail to

postcards forces communicants to use the fee-based services provided by Securus.

(ECF No. 129, PageID.3539).  However, Proch fails to acknowledge that "[t]he

County Board of Commissioners required that all revenue obtained from Securus

services be used for the betterment of the inmates."  (ECF No. 117, PageID.1174).

Moreover, it is undisputed that Securus services were already in place in the Jail prior to implementation of the postcard-only policy.  (ECF No. 117-7, PageID.1769; *see also* ECF No. 129, PageID.3532-33).   To the extent that any pecuniary motivation is present, that interest is obviated by the fact that all such funds are required to be used on behalf of the inmates themselves.  Even construing the facts in the light most favorable to Proch as the nonmoving party, Proch has conceded that, albeit rare, contraband does enter the jail via jail mail, and that going to a postcard-only policy does save time, though Proch argues it does not save enough time.  Simply put, Proch argues that so few drugs come in through the mail compared to the limited amount of time saved by having a postcards-only policy, meaning the motivation must be financial.  Proch's argument fails to account for that fact that the alleged financial windfall has been spent providing free tablets and other services  to inmates, features that Proch availed himself of frequently.   (ECF No. 117, PageID.1178 ("[A]s of November 30, 2022, [Proch] made 850 phone calls totaling 4,974.05 minutes, and by using the tablet received 17 video, 72 photographs, and sent and received numerous lengthy emails between he and his family/friends.")).

Proch's own use of the services available notwithstanding, his argument misses a crucial point.  The financial benefit from the Securus services that he claims motivated the postcard-only policy was already in place before the policy was changed.  In fact, at no point does Proch suggest or request that the Securus services

be discontinued.

Taken on its face, Proch's argument requires the Court to find that Defendants' primary reason for moving to a postcard-only policy was to generate an incremental increase in revenue from outside communicants choosing to use electronic means of communication rather than mailing postcards, even though this revenue was required to be used for the benefit of the inmates. Nevertheless, Proch argues that there is no commonsense connection between preventing the introduction of dangerous contraband into the Jail and the manner in which the hundreds of pieces of correspondence enter the Jail, undergo inspection, and find their way to the inmates each day. This argument falls short.

In an environment where involuntary confinement requires never-ending vigilance and even a paperclip or staple presents a security risk, there is an obvious connection between the type and manner of items introduced into the Jail, even where a constitutionally protected right to communication is impacted. Proch's argument thus unavoidably becomes that Defendants had a pecuniary motive to generate a financial benefit to inmates by infringing on their First Amendment right to receive mail in a preferred format. Although the postcard-only rule may impose logistical limitations, the policy allows outsiders to communicate with inmates safely, efficiently, and without the known risk of outside persons hiding contraband in the seams of the envelope and even in the fiber of the paper itself.

As to the second *Turner* factor, Defendants argue that in this case, "the alternative means of communication are greater because inmates also have the option of communicating with the tablet in addition to the phone" and

> the cost of a postage stamp was 60 cents, whereas an 'electronic' stamp is 50 cents and a postcard stamp is only 44 cents. At the same time, communication by an unlimited number of postcards is also still available as well as a free at-facility visit and an unlimited number of remote video visits.

(ECF No. 117, PageID.1186). In support of their position, Defendants cite *Simpson v. County of Cape Girardeau, Missouri*, 879 F.3d 273, 280–81 (8th Cir. 2018), in which the Eighth Circuit reasoned that the plaintiff's "ability to communicate with her [incarcerated] son ha[d] not been completely foreclosed" because she could still send him "as many postcards as she likes[,]" "receive collect calls from [her son,] and visit him on Saturdays." *Id.* at 280–81. Proch argues in response, also by way of the Eighth Circuit, that "[a] policy fails the second *Turner* factor when the alternative means of communication 'are illusory, impractical, or otherwise unavailable.' *Hum. Rts. Def. Ctr. v. Baxter Cnty. Ark.*, 999 F.3d 1160, 1165 (8th Cir. 2021)." (ECF No. 129, PageID.3543).

Under the second *Turner* factor, the Court considers whether detainees "have alternative means of exercising the constitutional right they seek to assert." *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003) (citing *Turner*, 482 U.S. at 90) ("Alternatives to visitation need not be ideal, however; they need only be available. Here, the

alternatives are of sufficient utility that they give some support to the regulations, particularly in a context where visitation is limited, not completely withdrawn."). However, *Baxter* does not reach a determination on the second factor; rather, that matter was remanded so the district court could make a "finding on what, if any, alternative means are available to [an outside mailer] to exercise its 'First Amendment interest in access to prisoners.' *Thornburgh*, 490 U.S. at 408, 109 S.Ct. 1874." *Baxter Cnty.*, 999 F.3d at 1166. Moreover, the Eighth Circuit found that the postcard-only policy in that case "looks like a total ban—it instructs [j]ail staff not to deliver books and magazines to inmates." *Id*.

While Proch argues that "[t]he only free option is one thirty-minute video call at the Jail per week per incarcerated person" (ECF No. 129, PageID.3543), this argument ignores the fact that if the postcard-only policy were revoked, mailing letters in envelopes is not free because the sender must still purchase stationary and stamps. Moreover, there is no authority before this Court suggesting that prisoners must be provided with free alternatives for communication. More to the point, Proch does not argue that the postcard-only policy in this matter is a total ban on books and magazines as like the policy at issue in *Baxter County*. In fact, it is undisputed that the Jail's policy allows for books and magazines to be delivered to inmates. As the Undersigned has previously noted, "Proch does not carry his burden in explaining why his friends and family cannot utilize other means of communication such as

13

visitations and phone calls.  True, these are not perfect substitutes for personal mail, but 'alternatives to' mail 'need not be ideal, . . . they need only be available.'" (ECF No. 37, PageID.280).

"Under the third *Turner* factor, we must consider the 'impact accommodation . . . will have on guards and other inmates, and on the allocation of prison resources generally.' *Washington v. Harper,* 494 U.S. 210, 225, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990)." *Jones v. Caruso*, 569 F.3d 258, 272 (6th Cir. 2009).  Defendants argue that "a return to regular mail would reintroduce contraband into the [J]ail through the mail system, a potentially deadly event in a time of high mortality from Fentanyl." (ECF No. 117, PageID.1187).  Conversely, Proch argues that "there is no evidence that there was a problem with contraband or that the old policy was ineffective at interdicting contraband" and that "the time and resource savings under the new policy is minimal at best." (ECF No. 129, PageID.3546).

Although Proch asserts that contraband coming in through the mail was "not a problem," he does not deny that it has happened.  It is undisputed that the most obvious alternative would be manually inspecting all envelopes, stamps, seams, and paper by hand, which using commonsense alone suggests would require more than "minimal" expense and labor.  There is evidence that outside parties have sought to introduce contraband via traditional mailings.  However, there is no evidence before this Court that outsiders have attempted to introduce contraband via postcards.  The

impact is thus patent.

As to the fourth factor, the Undersigned had previously observed:

> Last, the Court considers "whether the presence of ready alternatives undermines the reasonableness of the regulations." *Bazzetta*, 539 U.S. at 136. Jails need not implement the "least restrictive" policy available; however, if the detainee can identify "some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal," then the jail's chosen policy might be unreasonable. *Id.* The most obvious alternative to the jail's postcard-only policy would be to have officials inspect mail for contraband; however, such a policy could impose significant burdens on prison safety and security. Although Proch carries the burden of establishing that such a policy would have no more than a *de minimis* impact, he provides no evidence on this point.

(ECF No. 37, PageID.281). Proch's arguments and the evidence in support of them are not significantly different on this motion. Proch asserts that manual inspection would be sufficient, but this idea has already been rejected.

Proch also argues that the Jail could purchase electronic screening machines. (ECF No. 129, PageID.3548). The only evidence before the Court is that such machines cost roughly $125,000-150,000. (ECF No. 117, PageID.1176). "*Turner* does not impose a least-restrictive alternative test but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." *Overton*, 539 US at 136 (citing *Turner*, 482 US at 90–91). Purchasing machines costing north of one hundred thousand dollars is not a *de*

*minimis* cost.  Finally, Proch argues that the Jail could accommodate with "in-person visits and removing the barriers to accessing Securus's services."  (ECF No. 129, PageID.3548).  In-person visits are already available, and Proch does not explain what "barriers" could be removed or what cost that would involve.

Although Proch carries his burden of showing alternatives exist, he fails to demonstrate that any of them accommodate his asserted rights without imposing more than *de minimis* costs to achieve the same penological goals.  Accordingly, the *Turner* factors all weigh against Proch's claim for First Amendment violations.

### 2.     Due Process Claim

In Count II of Proch's Amended Complaint, he alleges that Defendants violated his Fourteenth Amendment rights, in violation of 42 U.S.C. § 1983, by having "a policy or practice of not providing an opportunity for intended recipients of any rejected, refused, or destroyed mail to appeal and/or challenge the decision." (ECF No. 89, PageID.930).  Defendants state that

> the Jail's policy was changed in April 2023, so Plaintiff's claim appears to be limited to the time period of August 1, 2022 through the date of the change.  ECF No. 117, PageID.1191.  Proch does not appear to substantially disagree: "In April 2023, the Jail changed the mail policy to explicitly provide that a mail rule violation will be issued when mail is refused."  ECF No. 117-20 at 2.

(ECF No. 129, PageID.3550, n. 2).  However, review of the 2023 amendments to the policy indicates that upon identifying a mail rule violation, a lieutenant will "issue a letter to the sender to notify the reason the mail was refused" and that "[t]he

16

original sender will have five days to object to the referral." (ECF No. 117-20, PageID.2288).

Proch alleges that his due process rights were violated because he "never received any Mail Violation forms during his incarceration" to alert him that mail addressed to him was found to be in violation. (ECF No. 129, PageID.3551). Proch bases this argument in part on his allegation that he failed to receive a letter from his partner's aunt (*Id.*), which he contends was rejected. Proch does not offer information as to when the letter was sent or what the letter contained. Defendants argue that "the only procedure required to the inmate is a notice, which is what the Jail's August 2022 to April 2023 policy required." (ECF No. 117, PageID.1193). Proch responds, in pertinent part, that "the 2022 Mail Policy was unconstitutional [because] it did not require any notice to the sender." (ECF No. 129, PageID.3552). This allegation is borne out by review of the 2022 policy. (ECF No. 117-7, PageID.1769).

The Sixth Circuit has held that:

[A]n incoming mail censorship regulation must provide that notice of rejection be given to the inmate-recipient. The need for such a requirement is evident: without notice of rejection, censorship of protected speech can escape detection by inmates and therefore go unchallenged. Although prison officials may have occasionally, or even consistently, given notice to inmates, the regulation does not require that notice be given.

Second, we hold that the mail censorship regulation is insufficient because it fails to require that notice and an opportunity to protest the

decision be given to the author of the rejected letter. We reach this conclusion for two reasons. First, the decision in *Martinez* . . . was premised on the fact that the First Amendment rights of free citizens were implicated by the censorship of prisoners' mail. Without notifying the free citizen of the impending rejection, he would not be able to challenge the decision which may infringe his right to free speech. *Cf. Trudeau v. Wyrick,* 713 F.2d 1360, 1366 (8th Cir. 1983) (author of letter brought a First Amendment challenge); *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1027–28 (2d Cir. 1985) (the author would have standing to challenge interference with prisoners' mail). Second, since the inmate-recipient would not have seen the contents of the withheld letter, he may require the aid of the author to meaningfully challenge the rejection decision. *See Cofone v. Manson,* 409 F. Supp. 1033, 1042 (D. Conn. 1976) (holding that a publisher must receive notice when a prison official decides to withhold a particular publication since a prisoner "cannot be expected to marshal arguments in favor of its admission without the assistance of someone familiar with the material").

We conclude, finally, that a mail censorship regulation must provide for an appeal of the rejection decision to an impartial third party prior to the letter being returned. This is necessary to ensure that future rejection decisions are fair, and based on appropriate factors.

*Martin v. Kelley*, 803 F.2d 236, 243–44 (6th Cir. 1986) (citations omitted).

Consistent with the Undersigned's previous Report and Recommendation touching this issue, "[f]or all Proch knows, his withheld mail may have actually complied with the postcard-only policy, or it may have been legal mail—both of which he would have had a clear right to under the First Amendment." (ECF No. 37, PageID.287). Accordingly, "[w]ithout any notice of his rejected mail, Proch cannot confirm whether the mail did not comply with the [J]ail's post-card only policy" (*Id.*), and neither could the sender.

In sum, after construing the evidence in the light most favorable to Proch, the

Undersigned has concluded that there is a genuine issue of material fact as to whether mail addressed to him was withheld without the due process to which he was entitled under *Martin*.   Accordingly, Defendants' motion for summary judgment as to Proch's Due Process claim should be denied.

### 3.    First Amendment Retaliation Claim

In his third claim, Proch alleges that he "engaged in petitioning activity protected by the First Amendment when he filed grievances, filed this action, and sent a letter to Defendant King disputing the determination that he must reimburse the County for the cost of his incarceration."  (ECF No. 89, PageID.932-33, ¶ 171). Based on these stated protected activities, he asserts that Defendants were motivated to "interfere[] with his efforts to file this lawsuit, they sent him a bill for reimbursement without the statutorily required fair investigation of his financial status, and they singled him out for debt collection efforts that they did not pursue against other similarly situated formerly incarcerated people in the County."  (ECF No. 89, PageID.933).

The parties agree that Proch must show that he (1) "engaged in protected conduct"; (2) "an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct"; and (3) "the adverse action was motivated at least in part by [his] protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  (*See* ECF No. 117, PageID.1194; ECF

No. 129, PageID.3555).  Proch argues that "after [he] exercised his First Amendment rights by filing grievances, filing this lawsuit, and contesting his debt, the County responded with a threat to sue him for nearly $14,000."  (ECF No. 129, PageID.3557).  The protected activity upon which he would base his retaliation claim is that, following his release from incarceration, the Jail notified him that it intended to collect payment for his incarceration pursuant to MCL 801.83(1), which provides in pertinent part, "The county may seek reimbursement for any expenses incurred by the county in relation to a charge for which a person was sentenced to a county jail . . . [f]rom each person who is or was a prisoner, not more than $60.00 per day for the expenses of maintaining that prisoner . . . for the entire period of time the person was confined in the county jail. . . ."

The timeline of these events is instructive.  Proch filed the present action on September 9, 2022.  (ECF No. 1).  Proch was released from the Jail around four months later, on January 13, 2023.  (ECF No. 117-23, PageID.2437).  From the evidence before the Court, it appears that on March 27, 2023, the St. Clair County Sheriff's Office sent Proch an invoice for the amounts he owes pursuant to MCL 801.83.  (ECF No. 117-23, PageID.2437).  Proch sent a letter dated April 10, 2023, to the Jail addressed to the attention of Sheriff King stating, "I dispute having any obligation for this debt." (ECF No. 117-23, PageID.2436).  On May 25, 2023, Karen Roy sent a letter in her capacity as the St. Clair County Jail Reimbursement Clerk to

Proch alerting him that his debt was a "statutory obligation" and that

> MCL 801.87 provides that 'within 6 years after the release from a
> county jail of a sentenced prisoner or a pretrial detainee whose
> prosecution resulted in conviction for a felony, an attorney for that
> county may file a civil action to seek reimbursement from that person
> for maintenance and support of that person while he or she is or was
> confined in the jail.' Please advise whether such a suit will be
> necessary.

(ECF No. 117-23, PageID.2438). Throughout the briefing, Proch characterizes that
notice as a "threat" of litigation. Accordingly, Proch avers that "a jury could find
that the threat [to] [him] was an adverse action both on its own and as part of 'an
entire campaign' of adverse actions which, taken together, 'would likely chill a
person of ordinary firmness from continuing to engage in [protected] activity.'
*Thaddeus-X*, 175 F.3d at 394, 398. . . ." (ECF No. 129, PageID.3556).

The crux of this claim is whether a letter asking Proch if a collections suit on
a statutory obligation would be necessary qualifies as an adverse action motivated
to chill this litigation. "To plead an adverse action, a plaintiff must allege, at
minimum, bad faith with retaliatory motive." *Morrissey v. CCS Servs., PLLC*, No.
19-CV-13027, 2020 WL 5878214, at *4 (E.D. Mich. Oct. 2, 2020). The evidence in
this case indicates that collection efforts were initiated with an invoice mailed to
Proch roughly two months after he was released from the Jail. (ECF No. 117-23,
PageID.2437). Proch, however, argues that the threat of the lawsuit shows an
adverse action because the Jail's policy was not to send the debts to collections until

they were 90 days past due.  (ECF No. 129, PageID.3558).  Proch further argues that only three collections lawsuits were filed by the Jail in 2022-23.  That said, Proch provides no evidence that the Jail sent his account to collections or filed a lawsuit. The only evidence before this Court is that the Jail asked Proch if a suit would be necessary in light of his emphatic letter denying the obligation, and that this exchange occurred in light of a statutory obligation that falls on all similarly situated former inmates.  Although Proch may have perceived this question as threatening, there is no indication on the record that the Jail's efforts to collect the amounts owed by Proch were in any way accelerated, unusual, or in bad faith.

In short, Proch "claims retaliatory motive without additional factual support." *Morrissey*, 2014 WL 6977651, at *4.  There is nothing about the timing or tone of the Jail's communication to suggest otherwise.  "To plead an adverse action, a plaintiff must allege, at minimum, bad faith with retaliatory motive." *Id.*  Given the absence of an adverse action or an improper motive in the Jail's collections efforts, Defendants' motion for summary judgment should be granted as to Proch's First Amendment retaliation claim.

### 4.   Qualified Immunity

Defendants next argue that "[b]ecause there is not sufficient case law to establish that a jail cannot go to a postcard only policy on these facts, Defendants Lt. Olejnik and Lt. Adams, as well as Sheriff King in his personal capacity, are entitled

to qualified immunity." (ECF No. 117, PageID.1198). Proch responds that "the [l]ieutenants are individually liable for the inadequate due process, whether because of the policy they drafted or because they failed to train deputies to ensure they consistently provided notice." (ECF No. 129, PageID.3561). As to Sheriff King, Proch argues that "King is also individually liable for Mr. Proch's retaliation claim. The threat to sue Mr. Proch was sent on behalf of King, from his office." (*Id.*).

Public officials who violate a plaintiff's constitutional rights while acting under the color of law may be liable under 42 U.S.C. § 1983. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). A plaintiff bears the burden of showing that a clearly established right has been violated and that the official's conduct caused that violation. *Essex v. Cnty. of Livingston*, 518 F. App'x 351, 356–57 (6th Cir. 2013). The Sixth Circuit has specifically held:

> The doctrine of qualified immunity affords protection against individual liability for civil damages to officials insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Summar v. Bennett*, 157 F.3d 1054, 1057 (6th Cir.1998); *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir.1994); *Henry v. Metropolitan Sewer District*, 922 F.2d 332, 339 (6th Cir.1990). The Supreme Court has explained that the contours of the right allegedly violated "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982).

*Strouss v. Michigan Dep't of Corr.*, 250 F.3d 336, 344–45 (6th Cir. 2001).

Here, both sides have argued strenuously about the constitutionality of

postcard-only policies, each producing instances where such polices were upheld or overturned.  (*See* ECF No. 117, PageID.1182; ECF No. 129, PageID.3537).  In fact, Proch even acknowledges that "many courts, including this one, have reached the opposite conclusion" when addressing such postcard-only policies.  (ECF No. 129, PageID.3537).  There is simply no factual or legal basis before this Court to find that Defendants in their individual capacities could have reasonably known they were violating Proch's constitutional rights on an issue that even he admits has conflicting results in the case law.  Based on the briefing, it appears correct for Sheriff King remain in this matter in his official capacity as the Sheriff of St. Clair County; however, Proch has failed to establish that Olejnik, Adams, or King are not entitled to qualified immunity from Proch's § 1983 claims in their individual capacities.

### 5.   Declaratory Relief Claim

Defendants argue that "[Proch's] claim for declaratory relief is moot for the same reason this Court found that his claim for injunctive relief was moot, and, thus, it must also be dismissed on those grounds."  (ECF No. 117, PageID.1198).  In response, Proch argues that his demand for declaratory relief is not moot because:

> the Court has set a new deadline for Mr. Proch to move for class certification, so that previous ruling is not controlling.  Instead, Mr. Proch's claims for injunctive and declaratory relief should be allowed to move forward under the 'inherently transitory' exception to mootness, which applies when the named plaintiff in a class action is unlikely to be subject to a challenged policy long enough for a court to

rule on class certification.

(ECF No. 129, PageID.3564).  Proch bases this argument on *Gerstein v. Pugh*, 420 U.S. 103, 111 no. 11 (1975), in which the Supreme Court observed: "This case belongs, however, to that narrow class of cases in which the termination of a class representative's claim does not moot the claims of the unnamed members of the class.  *See Sosna v. Iowa*, 419 U.S. 393, 95 S. Ct. 553, 42 L. Ed. 2d 532 (1975)." Accordingly, Proch argues that "the Mail Policy continues in effect, so it is certain that class members will continue to suffer the same injury, and they will be unable to vindicate their rights as a class if the claims for prospective relief are always mooted before the Court can rule on class certification."   (ECF No. 129, PageID.3565).

Although Proch does not provide a citation to the "new deadline . . .  for class certification," which he mentions in his response (ECF No. 129, PageID.3564), it appears that he is referring to this Court's most recently amended scheduling order in which class discovery ends "3 months after ruling on dispositive motions" and motions for class certification are due "30 days from the end of class discovery." (ECF No. 104, PageID.1028).  As such, it appears theoretically possible that a class could yet be certified following this Court's ruling on the instant motion. Accordingly, Defendants motion to find Proch's declaratory claims moot should be denied without prejudice.

### 5.   Conspiracy Claims

In his third claim, Proch alleges that "Defendants conspired to violate [his] constitutional rights by unnecessarily and indiscriminately prohibiting non-postcard mail, preventing [Proch] from communicating with his family and children." (ECF No. 89, PageID.931, ¶ 165).  Defendants argue on summary judgment that "[Proch] has no evidence that the County Defendants conspired with Securus to implement the postcard only policy to force individuals to use the pay features on the tablet." (ECF No. 117, PageID.1199).  Proch responds that "[b]ecause Securus has been dismissed from this case based on [his] failure to state a conspiracy claim against it, ECF No. 124, [he] does not pursue his claim for conspiracy here.  But [he] reserves the right to challenge that dismissal." (ECF No. 129, PageID.3565).  Accordingly, Defendants' motion for summary judgment as to Proch's conspiracy claim should be granted.

### D.   Conclusion

For these reasons, I **RECOMMEND** that this Court **DENY** Defendants' motion for summary judgment as to Proch's Due Process claim and demand for declaratory relief, and **GRANT** Defendants' motion as to all remaining claims. (ECF No. 117).

III.   **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address

each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 14, 2025                          s/ PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge